UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:15-cr-154 |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| STEVEN WILSON, | : | |
| Defendant. | : | |

___

**ENTRY AND ORDER DENYING MOTION TO SUPPRESS (DOC. 22)**
___

Under the Indictment, Defendant Steven Wilson ("Wilson") is charged with conspiracy to possess with intent to distribute in excess of 500 grams of crystal methamphetamine (Count 1) and attempted possession with intent to distribute in excess of 500 grams of crystal methamphetamine (Count 2).  (Doc. 5.)  This case is now before the Court on Wilson's Motion to Suppress (Doc. 22), by which he seeks to suppress (1) his statements to law enforcement officials, (2) evidence seized from his cell phone, and (3) evidence seized from his residence.  On February 9, 2016, the Court held a hearing on the Motion to Suppress and the parties have submitted post-hearing memoranda.  (Docs. 28, 31, 32.)  This matter is therefore fully briefed and ripe for review.  For the reasons stated below, the Motion to Suppress is **DENIED**.

    I.    <u>**BACKGROUND**</u>

On or about the last week of August 2015, Detective Alex Hillman of the Troy Police Department and an Ohio-based Drug Enforcement Administration ("DEA") Task Force received

information from a confidential source indicating that a U.S. mail package containing a large quantity of methamphetamine would be delivered to a business known as United Auto Group ("UAG"), located at 1000 Shiloh Springs Road in Trotwood, Ohio. (Doc. 26 at 6.) The confidential source indicated that the package was addressed to Jeremy Faris ("Faris") at UAG, who would then provide the package to Wilson. (*Id*. at 6:10-13.)

Once Detective Hillman received this information, he asked postal inspector Suzanne McDonough if she would take a closer look at packages delivered to this address, which she agreed to do. (*Id*. at 7:6-11.) On September 2, 2015, McDonough notified Detective Hillman that a drug dog had alerted to the odor of narcotics from a package to be delivered to UAG. (*Id*. at 7:16-19.) On September 3, 2015, McDonough opened the package pursuant to a search warrant and found 2.4 pounds of methamphetamine. ((*Id*. at 8:9-11, 9:20.) Pursuant to another court order, law enforcement removed the methamphetamine from the package and replaced it with sham material, a GPS tracking device, and a sensor to let authorities know when the package was opened. (*Id*. at 10:5-12.) The DEA then obtained an anticipatory search warrant for the UAG facility.

On September 3, 2015, McDonough, acting undercover as a postal carrier, made a controlled delivery of the package to UAG. (*Id*. at 11:11-16.) Within 10 minutes of delivery, Wilson left his residence and drove to the UAG facility. (*Id*. at 18:9-19.) Wilson met Faris outside the UAG facility and then walked inside. (*Id*.) Soon after, the detectives received an alert that the package had been opened, which prompted them to serve the search warrant. (*Id*. at 20:1-4.) Wilson exited the building, but was quickly handcuffed by several agents and placed in the back of a police cruiser. (*Id*. at 20:21-25.) Detective Hillman testified that they took Wilson's cell phone and placed it on the dash of the cruiser to prevent destruction of any

potentially relevant evidence.  (*Id*. at 38:5-10; 49:24-25.)

After briefly speaking with Faris, Special Agent Allen and Detective Hillman took Wilson into a garage where Special Agent Allen read Wilson his Miranda warnings from a form DEA-13A card—a laminated yellow card that is issued to law enforcement for that purpose. (*Id*. at 21:10-21:4 and Gov't Ex. 5.)  Wilson thereafter orally waived his Miranda rights and consented to a search of his phone and residence.  (*Id*. 22:5-21.)

Wilson was then transported to the DEA office in Miamisburg, Ohio.  (*Id*. at 23:14-25.) Per policy, Wilson was handcuffed in the back of the cruiser, but the handcuffs were removed once they arrived.  (*Id*. at 23:23-24-14.)  Once inside the office, Wilson was reminded that he had been advised of and waived his *Miranda* rights.  (*Id*. at 24:18-25.)  Wilson then read a standard form given to arrested individuals describing their rights.  (*Id.* at 25:1-15.)  Wilson wrote his initials next to each of the five rights on the form and signed the bottom of the form to indicate his understanding and waiver of his rights.  (*Id*. and Gov't Ex. 6.)  Detective Hillman and Task Force Officer Tim Mart also signed the form as witnesses.  (*Id*. at 25:16-19.)

After waiving his rights, Wilson signed a consent form for officers to search both his cell phone and residence.  (*Id*. at 26:3-10.)  The consent form states:

CONSENT TO SEARCH

1. I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH (Describe the person, places or things to be searched.)

   42 S. Monmouth Drive
   Dayton, OH

   Black HTC Cellular phone

2. I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.

3. I FREELY CONSENT TO THIS SEARCH.

3

| | |
|---|---|
|   9/3/15 |   /s/Steven Wilson |
| Date | Signature |

Witnesses:     /s/Detective Alex Hillman

                                  /s/TFO Tim Mart

(Gov't Ex. 7.)

Wilson neither resisted nor indicated that he did not understand what was happening during his interaction with law enforcement. (*Id*. 26:21-27:4.) After Wilson waived his *Miranda* rights, Special Agent Allen and Detective Hillman discussed with Wilson that, if he cooperated, prosecutors would take his cooperation into consideration when it came to charges and sentencing, but that he could still face the same charges as other individuals involved. (*Id*. at 36:5-12.) Once the interview was complete, Wilson left the DEA office and went home. (*Id*. at 35:4-7.)

Despite having received Wilson's consent to search his residence, the officers also obtained a search warrant. (*Id*. at 27:5-9.) On September 3, 2015, Wilson's residence was searched in reliance on the search warrant. (*Id*. at 28:1-12.) Wilson's cell phone was examined by forensic specialists and returned to him on September 8 or 9, 2015. (*Id*. at 28:13-16.) Detective Hillman testified that between the time when Wilson's consent was obtained (first orally and then in writing) until the cell phone was returned, Wilson never communicated a desire to withdraw his consent to search his phone. (*Id*. at 29:1-9.)

### II.    WILSON'S MOTION TO SUPPRESS

Wilson moves to suppress his statements to law enforcement, the evidence seized from his cell phone; and the evidence seized from his residence. He argues that this evidence should be suppressed because (1) his statements were made pursuant to an unlawful arrest, (2) the

4

waiver of his *Miranda* rights was not made knowingly and voluntarily, (3) he did not voluntarily consent to the search of his cell phone and the search exceeded the scope of his consent, and (4) no probable cause supported the search warrant for his residence. The Court addresses each of these arguments in turn below.

### A. Wilson's Arrest

Wilson argues that his statements to law enforcement should be suppressed because they were made after he was subjected to an unlawful arrest. (Doc. 28 at 3 (citing *Florida v Royer*, 460 U.S. 491, 501 (1983).) This argument fails because law enforcement had probable cause to arrest Wilson when he left the UAG facility.

Law enforcement may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that he has committed a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The standard for probable cause is a "practical, nontechnical conception" that takes into consideration that totality of the circumstances known to law enforcement. *Illinois v. Gates*, 462 U.S. 213, 230-32 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). Probable cause, by definition, deals with probabilities and is based upon the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Brinegar*, 338 U.S. at 175).) The Supreme Court has found that probable cause existed to arrest an individual where a reliable confidential informant provided information about the individual's involvement in drug trafficking and the police observed the individual acting consistently with that information. *McCray v. Illinois*, 386 U.S. 300, 304 (1967) (confidential informant, who previously provided reliable information regarding drug trafficking on 15 to 24 occasions, told police that suspect was selling narcotics at specific address and had narcotics on his person, and police observed suspect engage in behavior consistent with

the sale of narcotics at that address).

Detective Hillman received detailed information from a confidential source regarding a shipment of methamphetamine. Specifically, Detective Hillman was told that, within a week or so, a package containing methamphetamine would be delivered to the UAG facility. (Doc. 26 at 6:2-13.) Jeremy Faris would receive the package and then call Wilson to retrieve it. (*Id.*) Just as the confidential source indicated, a package containing methamphetamine was sent to the UAG facility, which the postal service intercepted. Within ten minutes after the package's delivery, Wilson arrived at the UAG facility—again, consistent with the information provided by the confidential source. After Wilson went inside, police received an alert that the package had been opened. Thus, when Wilson exited the UAG facility, it was reasonable for the police to infer—based on the facts known to them—that Wilson had arrived to pick up the methamphetamine, but fled after the package was opened and its contents were revealed. These facts constituted probable cause for Wilson's arrest. Accordingly, the argument that his arrest was unlawful, and therefore his statements to law enforcement should be suppressed, does not have any merit.

### B. Wilson's Waiver of his *Miranda* Rights and Consent to Search Cell Phone

Wilson argues that his statements to police and the evidence seized from his cell phone should be suppressed because he was coerced into waiving his *Miranda* rights consenting to the search. This argument fails because there is no credible evidence establishing that Wilson did not voluntarily provide the waiver and consent.

To be valid, a waiver of *Miranda* rights must be "the product of a free and deliberate choice rather than intimidation, coercion or deception." *Machacek v. Hofbauer,* 213 F.3d 947, 954 (6th Cir. 2000) (citing *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). The Supreme Court

has explained:

> The waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the investigation' reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). In making this assessment, "the relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking any time.'" *Garner v. Mitchell,* 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Colorado v. Spring,* 479 U.S. 564, 573–74 (1987)).

Wilson argues that he was coerced for two reasons. First, he argues that the circumstances of his arrest were intimidating because there were "numerous agents, wearing bullet proof vests and armed, forcing him to the ground at gunpoint" and he was forced to sit handcuffed "for a time" in the back of a police cruiser. (Doc. 28 at 6.) Second, Wilson argues that he was told that if he cooperated with agents that he would have "no problem" and that "as long as [he] cooperated with them [he] would be okay." (*Id.*) As to his cell phone, Wilson contends that agents told him that they only wanted to review his contacts, not that they would review all of his text messages too. (*Id.* at 7.) Both arguments fail.

The agents involved in Wilson's arrest did not take any actions beyond what was reasonable to secure their safety and apprehend an individual suspected of dealing a substantial amount of methamphetamine. Wilson does not allege that any agents physically harmed him or restrained him for an unreasonable period of time. Wilson was first read his *Miranda* rights from a form DEA-13A card. (Gov't Ex. 5.) That card plainly states Wilson's rights, directs

the officer to ask if the suspect understands his rights, and then to ask if the suspect is willing to answer some questions. There is nothing coercive about the language on the form DEA-13A card. These circumstances fail to establish that the agents pressured Wilson into waiving his *Miranda* rights.

Wilson's assertions regarding what he was told by agents are contradicted by the record. Wilson provided both oral and written consent to the searches of his cell phone. The facts establish that this consent was voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (to be valid, a consent to search must be "freely and voluntarily given"). Detective Hillman testified that Wilson was told that his cooperation would be taken into consideration by prosecutors, but that he could still face the same charges as other individuals. The Court found Detective Hillman's testimony credible. Wilson's claim that agents told him that they would only review the contacts on his cell phone is contradicted by Detective Hillman's testimony and the "Consent To Search" form that Wilson signed, which contains no such restriction. Wilson was told that his phone was being taken to a forensic examiner. (Doc. 26 at 29:4-9.) Detective Hillman spoke to Wilson several times during this process, but Wilson never withdrew his consent to the search. (*Id.*)

In sum, the record establishes that Wilson's waiver of his *Miranda* rights and consent to search his cell phone were both valid.

### C. The Search of Wilson's Residence

Wilson argues that the search warrant for his house was not supported by probable cause. (Doc. 28 at 8.) This argument is principally based on the premise that Wilson's waiver of his *Miranda* rights was not valid, and, as a result, the statements that he made to police must be excised from the affidavit supporting the application for a search warrant. (*Id.* (citing *United*

8

*States v. Davis*, 430 F.3d 345, 357-58 (6th Cir. 2005)).) As Wilson's waiver of his *Miranda* rights was valid, Wilson's principal argument fails. Wilson alternatively argues that, even including his statements to police, the search warrant still fails to establish probable cause for the residential search. (Doc. 28 at 8.)

When evaluating an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). A reviewing court's task "is simply to ensure that the magistrate had a 'substantial basis for conclud[ing] that probable cause existed.'" (*Id.*)

Here, the affidavit provides a substantial basis for the Chief Magistrate Judge's conclusion that there was probable cause to search Wilson's residence. (Gov't Ex. 8.) The affidavit describes delivery of the package containing methamphetamine, Wilson's arrival at the UAG facility shortly after its delivery, and his attempt to leave the premises after the package was opened. The affidavit also includes Wilson's statements, after he waived his *Miranda* rights, that he had opened the package and also had cocaine and marijuana at his residence. Those facts, combined with the information in the affidavit based on the testifying agent's experience investigating similar crimes, established probable cause to search Wilson's residence.

### III.     CONCLUSION

For the reasons stated above, Wilson's Motion to Suppress (Doc. 22) is **DENIED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, June 8, 2016.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE
